426 F.2d 1222
 138 U.S.App.D.C. 228
 MIDWEST TELEVISION, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Escondido Community Cable, Inc., The
City of Escondido, Mission Cable TV, Inc., et al., Rancho
Bernardo Antenna System, Southwestern Cable Co., Intervenors.
WESTERN TELECASTERS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Escondido Community Cable, Inc., The
City of Escondido, Mission Cable TV, Inc., et al., Rancho
Bernardo Antenna System, Intervenors.
MISSION CABLE TV, INC., et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Western Telecasters, Inc.,
Midwest Television, Inc., Intervenors.
SOUTHWESTERN CABLE CO., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Western Telecasters, Inc.,
Midwest Television, Inc., Intervenors.
 Nos. 22077, 22096, 22237, 22260.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Oct. 31, 1969.
Decided Feb. 4, 1970.
 
 Mr. Charles A. Miller, Washington, D.C., with whom Messrs. Ernest W. Jennes, Arthur H. Schroeder and John P. Bankson, Jr., Washington, D.C., were on the brief, for petitioners in Nos. 22,077 and 22,096 and intervenors in Nos. 22,237 and 22,620. Mr. John E. Vanderstar also entered an appearance for petitioner in No. 22,077. Mr. William M. Barnard also entered an appearance for petitioner in No. 22,096.
 Mr. Robert L. Heald, Washington, D.C., with whom Messrs. Frank U. Fletcher, Edward F. Kenehan, James P. Riley, John C. Harrington and William P. Sims, Jr., Washington, D.C., were on the brief, for petitioners in No. 22,237 and intervenor Escondido Community Cable, Inc., and certain other intervenors in Nos. 22,077 and 22,096. Mr. Marvin Rosenberg also entered an appearance for intervenor Escondido Community Cable, Inc., and certain others in Nos. 22,077 and 22,096.
 Mr. Arthur Scheiner, Washington, D.C., with whom Messrs. Harold F. Reis and Edward S. O'Neill, Washington, D.C., were on the brief, for petitioner in No. 22,620 and intervenor Southwestern Cable Company in No. 22,077. Mr. Edward P. Taptich, Washington, D.C., also entered an appearance for intervenor Southwestern Cable Company in No. 22,077.
 Mr. John H. Conlin, Associate Gen. Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, Gen. Counsel, and Stuart F. Feldstein, Counsel, Federal Communications Commission, were on the brief, for respondent Federal Communications Commission. Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, also entered an appearance for respondent, Federal Communications Commission.
 Mr. Howard E. Shapiro, Atty., Dept. of Justice, entered an appearance for respondent, United States of America.
 Before FAHY, Senior Circuit Judge, and TAMM and ROBINSON, Circuit judges.
 FAHY, Senior Circuit Judge:
 
 
 1
 These cases, consolidated, arise on petitions to review an order of the Federal Communications Commission and a related order denying reconsideration of the former. The basic order prohibits expansion beyond the situation as it existed on August 23, 1966, of carriage by CATV systems in the San Diego area of Los Angeles television signals, with the exception that Rancho Bernardo Antenna Systems, Inc., and the Escondido Community Cable, Inc., in the San Diego area may expand in their respective communities carriage of Los Angeles signals. There is no contest now with respect to the Rancho Bernardo Antenna Systems, Inc. The order as contested by the CATV systems runs against the Mission Cable T.V., Inc., Pacific Video Cable Co., Inc., and Trans-Video Corp., all referred to herein as 'Mission,' and Southwestern Cable Co. It does not, however, run against Escondido Community Cable, Inc., and this exception is contested by Midwest Television, Inc., licensee of a VHF television station in San Diego, and by Western Telecasters, Inc.
 
 
 2
 Midwest, later joined by Western,[1] initiated the proceedings before the Commission. It sought relief under 47 CFR 74.1107d and 74.1109 of the Commission's rules governing CATVs, claiming that further carriage of Los Angeles signals in the San Diego market area would threaten the service there of existing VHF stations and the continued existence or commencement of UHF stations.
 
 
 3
 The distant signal rules relied upon by Midwest grew out of extensive rule making proceedings which led to the Commission's Second Report and Order. 2 F.C.C.2d 725 (1966). This Report states:
 
 
 4
 The plain fact is that on the record before us, it is not possible to give a definite answer to the future growth of CATV-- to whether it will achieve very substantial penetration in the major markets and, correspondingly, to what its impact will be upon UHF developments in these markets.
 
 
 5
 Second Report, supra, 2 F.C.C.2d at 773. Though reaching 'no final conclusion in this area,' the Commission recognized a substantial public interest problem which must be thoroughly explored. The Commission explained as follows how it intended to exercise its jurisdiction:
 
 
 6
 We must thoroughly examine the question of CATV entry into the major markets, and authorize such entry only upon a hearing record giving reasonable assurance that the consequences of such entry will not thwart the achievement of the congressional goals (of encouraging UHF development).[2]
 
 
 7
 Second Report, supra, at 776. The Commission believed that after conducting such an evidentiary hearing it would 'be in a position to make an informed judgment directed to the facts of a particular case.' Second Report, supra, at 782.
 
 
 8
 Section 74.1107a of the Commission's Rules[3] prohibits CATVs from importing distant signals into the major television markets without Commission approval after an evidentiary hearing showing that the carriage would be consistent with the public interest. Commission approval is not necessary, however, under a 'grandfather' provision, Section 74.1107d, permitting signals supplied by a CATV system as of February 15, 1966. In such a situation, however, a television station is permitted to petition the Commission under Section 74.1109 to limit the expansion of these signals into new geographical areas.[4] Both Mission and Southwestern were carrying Los Angeles signals in February 1966 and Midwest accordingly resorted to Section 74.1109 to prevent further expansion.[5] Approval is also unnecessary for the carriage of distant signals which do not involve an extension of the signals beyond their Grade B contour.[6] It is agreed that in this case some of the Los Angeles stations carried by the San Diego CATVs have a Grade B contour which extends into the San Diego market. The Second Report indicated, however, that a television broadcasting station, such as Midwest, could petition the Commission for relief from this 'Grade B' exception by resorting to footnote 69 of the Report, 2 F.C.C.2d at 786. It is there noted that if two major markets each fall within the other's Grade B contour, as in the case of Los Angeles and San Diego, a CATV might bring about an alteration of viewing habits and affect UHF development by equalizing the quality of the distant signals in the respective markets. Section 74.1109 accordingly permits relief in such a situation by means of ad hoc proceedings such as were initiated by Midwest here.
 
 
 9
 On July 20, 1966, the Commission, acting on Midwest's petition, granted temporary relief[7] from further CATV expansion pending the outcome of a hearing ordered to be held before an examiner. The issues specified included (1) a determination of potential CATV peneration in the San Diego market under conditions of unlimited CATV expansion; (2) the effect of such penetration on audiences of existing and potential San Diego television stations; and (3) 'the effects of present service and of unlimited expansion of service by CATV systems, generally * * * and particularly on existing, proposed, and potential UHF television service in the area.[8] Midwest was required to assume the burden of proof with respect to the last two issues.
 
 
 10
 The examiner found, and the Commission agreed, that CATV penetration could ultimately reach half the homes in the market and that thus expanded the CATVs would have a 'pronounced' effect on the potential audience of independent UHF stations. While unable to predict the audience the UHFs could be expected to generate in the market, the examiner did conclude that, 'whatever the potential audience * * * it will suffer some fragmentation.' He explained:
 
 
 11
 If the San Diego UHF stations are forced to compete with the signals of the Los Angeles independent stations, their competition will be with program formats specifically designed to appeal to the very minorities among which they must themselves seek their audience.
 
 
 12
 As to the effect of CATV expansion on UHF stations, the examiner found that if it could be assumed that such stations could become commercially viable absent CATV competition, the fragmentation described above would 'render it commercially impractical to operate the stations and * * * the service which they would otherwise provide will be lost.'
 
 
 13
 There was an important area in which the Commission disagreed with the findings of the examiner, that is, the extent of potential UHF audience in the San Diego market, and, related thereto, the possibility that UHF stations would become commercially viable absent further CATV competition. The examiner found that 'the only actual UHF experience in the market has been that of station KAAR,' an experience he said was not calculated to inspire confidence as to the future of UHF in San Diego. In this connection, however, he refused to take official notice of a transfer application of station KAAR, as requested by Midwest, commenting that 'were the examiner to rest findings thereon, any party would be entitled to an opportunity to show the contrary, 5 U.S.C. 6(d), and the point does not seem sufficiently crucial to risk reopening of this already protracted record.' The examiner also discredited an economic analysis of UHF potential in the area, called the Fischman Report, as too hypothetical and unreliable. Emphasizing that 'this is an evidentiary proceeding and must be decided solely on the facts of record,' the examiner found that there was no meaningful experience in the market upon which he could predict the success of UHFs and the size of their audiences and that to do so would be 'speculative in the extreme.' He accordingly concluded that no restrictions should be placed on the present or future operations of CATV systems in the San Diego market.
 
 
 14
 The Commision, differing in its view of the nature of the proceedings and the weight of the evidence, disagreed with the hearing examiner's ultimate conclusion. The Commission took official notice of the transfer application of UHF station KAAR and the resulting construction permit issued to KCST. Considering this and the other evidence, the Commission concluded that UHFs stand 'a fair chance for success,' and issued the order before us.[9]
 
 
 15
 We are not persuaded to disagree with the Commission. In reaching this conclusion we attend first to the nature of these proceedings, about which much is said by the parties. The Commission itself refers to the proceedings as follows:
 
 
 16
 The evidentiary hearing in this and other major market proceedings is not adjudication in the sense that it is concerned with a determination of past or present conduct of liabilities, but rather has the object of eliciting sufficient information to permit the Commission to make an informed policy judgment as to the best future course in the market involved.
 
 
 17
 We think the Commission's position as thus stated is a permissible one in the fulfillment of its responsibility to 'encourage the larger and more effective use of radio in the public interest.' 47 U.S.C. 303(g). The CATV petitioners disagree, urging that the proceedings are adjudicatory in the usual sense, with the consequence that the Commission's judgment must be confined to the facts proved on the record. We think, however, that even if the proceedings are considered adjudicatory, the Commission was not thereby prevented from drawing reasonable conclusions from the facts proved and those of which official notice was properly taken. Moreover, the Commission should not be denied flexibility, even in the context of adjudication, necessary to the formulation of policy on the basis of such a record.[10]
 
 
 18
 The portions of the Second Report discussed previously make it clear that the evidentiary hearing in such a case as this is intended to provide a record from which the Commission may determine the scope of existing and potential CATV operations in a particular market and whether their carriage of distant signals would unduly and adversely affect the public interest in the development of UHF broadcasting in that market. We bear in mind that in SEC v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947), the Court held that an administrative agency has 'less reason to rely upon ad hoc adjudication to formulate' agency policy than the courts do, because of the agency's rule making powers. The Court added that 'any rigid requirement (that the agency resort to rule making) would make the administrative process inflexible and incapable of dealing with many specialized problems' such as when 'the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule.'[11] Similar considerations are pertinent to the Commission's present specialized problem.
 
 
 19
 It is true that some of the issues resolved in the hearing were based on facts about particular parties.[12] But the conclusions challenged by the CATVs were of a different nature. The underlying problem called for the exercise of administrative judgment and expertise in the predication of future market conditions.[13] As this court stated in American Airlines, Inc. v. CAB, 89 U.S.App.D.C. 365, 368, 192 F.2d 417, 420 (1951):
 
 
 20
 When a regulatory action contemplates a proposed development, new, not existing, a type of judgment is required which is wholly absent from the mere evaluation of past facts to ascertain a present or past fact.
 
 
 21
 We there recognized that such judgments 'cannot be fashioned * * * (on) speculation devoid of factual premise,' but the courts must be 'realistic enough' to construe the evidence to 'include estimates or forecasts, or opinions, on future events.' American Airlines, Inc., supra, 89 U.S.App.D.C. at 369, 192 F.2d at 421. In the final analysis, we held that the
 
 
 22
 function of the agencies * * * (here) is to examine the relevant past and present and then to exercise a rational judgment upon that data to ascertain the public convenience and necessity in the reasonably foreseeable future.
 
 
 23
 American Airlines, Inc., supra, 89 U.S.App.D.C. at 369, 192 F.2d at 421.
 
 
 24
 Under the approach thus indicated we think the Commission had sufficient factual basis to support as reasonable the judgment it reached concerning future market conditions in San Diego, particularly as to UHF potential. As we have seen there is adequate support for the conclusion that there would be substantial penetration from an expanding CATV, with a harmful impact of such penetration on assumed UHF service and audience. The question is whether there is like support for the Commission's conclusion that UHFs stand 'a fair chance for success.' On that score the Commission admitted that 'the record * * * does not afford any positive assurance that San Diego independent UHF stations could attract audiences large enough to insure commercial success' and that 'certainly the experience of KAAR militates against their easy success.' But the Commission emphasized that the procedures adopted in the Second Report 'were not based on the assumption of immediately viable UHF independent stations' but were designed instead to preserve the opportunity for their potential growth in the future. In this regard the Commission gave substantial weight to the need for a new outlet for local advertising and accorded 'some weight' to the conclusion of the Fischman Report that without CATV expansion at least one UHF station could succeed in San Diego within a few years.[14] The Commission, in this respect differing from the examiner, also relied upon evidence that good quality signals can be received throughout the market by a well engineered UHF operation.
 
 
 25
 The Commission attributed the examiner's lack of confidence about the future UHFs solely to the experiences of KAAR, which, as the examiner himself recognized, had been transferred to new owners. Believing that 'it would be unrealistic to base our judgment as to the best future course in the San Diego market on circumstances that no longer exist,' the Commission took official notice of the 'significantly different proposals' contained in the transfer application of UHF station KAAR, and the improved technical facilities authorized by the new station's construction permit.
 
 The Commission concluded:
 
 26
 In sum, the failure of KAAR under its former owners affords no valid basis for a prediction as to the prospects of high-powered, well-managed UHF in San Diego and there is no other evidence in this record which warrants a conclusion that UHF could not succeed in this market within a reasonable period, absent unlimited CATV expansion. On the contrary, there is considerable indication that it stands a fair chance for success. We cannot, of course, make a finding that it will succeed, any more than we can find, with absolute certainty, that unlimited CATV expansion will doom it to failure. The only sure way to find out is to afford San Diego UHF a reasonable period to develop free from widespread competition from Los Angeles signals.[15]
 
 
 27
 Southwestern, though not Mission, urges that the Commission's ultimate conclusion is fatally defective because, as shown by the above statement, it is based at least in part upon data respecting the KAAR transfer application of which the Commission took official notice, without affording Southwestern, as requested in its petition for reconsideration, an opportunity to cross-examine and to offer rebuttal evidence. Southwestern places reliance upon Section 556e of the Administrative Procedure Act.[16] The Commission denied Southwestern's request as untimely and also because Southwestern did not challenge the substance of the matters officially noticed or give any indication of what matters it might bring forward in the way of rebuttal.
 
 
 28
 In passing upon this contention of Southwestern we first note that the existence of the basic facts of which official notice was taken, namely, the transfer application of KAAR, followed by grant of the application and of a construction permit to the transferee, in turn followed by that station going on the air, is not disputed. 'To show the contrary', see note 16, supra, was not possible. The Administrative Procedure Act does not bar the Commission from taking notice of such facts or require the reopening of the record because notice was taken of them.[17] The real question is whether the Commission was entitled to lean at all upon these facts, including the proposals in the application, in arriving at a judgment with respect to future UHF potential in the area. It seems to us that in the circumstances it could do so. In the first place it is clear a reopening was not a necessary condition to the position taken by the Commission that the officially noticed facts weakened the weight attached by the examiner to the failure of the predecessor station, KAAR; for undeniably a change had occurred which was relevant to the earlier KAAR experience.
 
 
 29
 There remains the question whether the situation represented by the new UHF station KCST-TV could be given any other weight by the Commission in considering the future of UHF in the area. As to this it seems quite doubtful that Section 556e of the Administrative Procedure Act, note 16, supra, precluded such consideration. The reliance placed on the new situation was not with respect to a factual determination. In the end it was one of judgment influenced by policy. True, Southwestern contends it could have adduced facts which would have undermined the reasonableness claimed for the judgment reached; but this seems to us to raise not a question controlled by Section 556e but one of fairness to the parties. The necessity for procedural fairness and adherence by the agency to the requirements of its statute is emphasized by the limited scope of judicial review due to judicial deference to the agency's findings and expertise. Nevertheless, considering the nature of these proceedings, involving ultimately an important judgment permeated with policy considerations as to how best to nurture the possible development of television service in a principal market, we are reluctant to construe Section 556e so as to exclude such reliance as the Commission, without reopening the record, here gave to the new UHF station.
 
 
 30
 In any event, we hold that the failure of Southwestern to challenge the basic facts officially noticed or to indicate any matters it might bring forward in rebuttal excused the Commission from granting its petition to reopen.[18] See Market Street Ry. Co. v. Railroad Comm., 324 U.S. 548, 561-562, 65 S.Ct. 770, 89 L.Ed. 1171 (1945). The Commission did not find that the new station would succeed. It only considered that the effort to do so cast light on the UHF potential in the area.
 
 
 31
 Moreover, the interim character of the decision should alleviate Southwestern's and Mission's concern. The Commission stated:
 
 
 32
 If UHF does not succeed in establishing itself in the San Diego area over the next several years or if there are some other startling technological developments, we shall re-examine the matter upon the basis of the new circumstances.[19]
 
 
 33
 The Commission's caution in this area seems warranted by the statement in the Second Report, which is not controverted by the parties, that once CATVs are entrenched in the major markets it would be 'difficult if not wholly impractical in light of the disruption which would result, to take effective action or attempt to roll back the situation.' 2 F.C.C.2d at 782.
 
 
 34
 We conclude from all the evidence before the Commission that there was a sufficient factual basis for its decision and for the restrictions placed by the Commission on the CATV petitioners in the San Diego market.
 
 
 35
 We have considered the contention of Mission and Southwestern that the Commission relieved Midwest of the burden of proof essential to the Commission's order. We do not agree. Since, as we hold, the record supports the order, the burden of proof was met. The policy considerations which entered into the final judgment were not due to a shift of the burden of proof, but to an acceptance by the Commission of the burden which in the end rested upon it.
 
 
 36
 Mission and Southwestern also contend that the limitation placed by the order upon their expansion at this time violates their rights of free speech guaranteed by the First Amendment. This argument centers upon the part of the order which precludes further geographical expansion now of Los Angeles signals through San Diego CATV systems. The First Amendment contention questions this exercise of the Commission's power to regulate radio communication in the public interest in 'the larger and more effective use of radio.' 47 U.S.C. 303(g). A regulation otherwise valid for this purpose is not invalid because it inevitably regulates the service of one branch of this industry by encouraging another when to do so is found on balance to further the larger public interest protected by the statute. NBC v. United States, 319 U.S. 190, 226-227, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Buckeye Cablevision, Inc. v. F.C.C., 128 U.S.App.D.C. 262, 267, 387 F.2d 220, 225 (1967); Black Hills Video Corp. v. F.C.C., 399 F.2d 65, 69 (8th Cir. 1968).
 
 
 37
 Finally, the judgment of the Commission with respect to Escondido Community Cable, Inc., challenged by Midwest and Western in Nos. 22,077 and 22,096, differed from that respecting the San Diego CATV systems generally, represented by Mission and Southwestern. The Commission held:
 
 
 38
 We have decided (on balance) to permit the Escondido system to carry Los Angeles signals within the City of Escondido * * * provided that it operates as an outlet for community self-expression by originating local affairs programming.
 
 
 39
 While Midwest and Western claim that Escondido is wholly oriented to San Diego for television service and that the entire market should be viewed as a whole, the Commission, in disagreeing, relied upon evidence that Escondido is a separated and self-contained community with the need of improved television service. Moreover, there are terrain factors affecting reception of San Diego stations. For while contiguous to the northern city limits of San Diego, the 11,000 homes in Escondido are to a large extent separated from San Diego by some thirty-three miles of sparsely settled land, and located in a valley where some sections did not receive San Diego signals satisfactorily. The Commission also thought that the Escondido Community Cable, Inc., deserved equitable consideration because of the extent of the construction and equipment purchases made prior to the start of the proceedings. Finally the Commission recognized that the subscriber potential within Escondido would not add significantly to the grandfathered Los Angeles signals carried by the other CATVs so as to have a serious impact on any San Diego UHF development. We cannot say that the Commission was not justified in relying upon these factors. They preclude us from finding that the exception of Escondido from the prohibitory order was arbitrary, discriminatory, or otherwise not within the competence of the Commission to make.
 
 
 40
 Affirmed.
 
 
 
 [1]
 San Diego Telecasters, Inc., former permittee of UHF station KAAR had intervened. When the station was transferred and licensed as KCST, its new owner, Western, was substituted as intervenor
 
 
 [2]
 The Congressional goals referred to are said to appear from 47 U.S.C. 303(s), the all-channel receiver legislation, to the effect that the development of UHF broadcasting is 'not only the best but the only practical way of achieving an adequate commercial and educational system in the United States.' H.R.Rep.No.1559, 87th Cong., 2d Sess. 4; S.Rep.No.1526, 87th Cong., 2d Sess. 7 (1962), cited by the Commission in its Second Report and Order, 2 F.C.C.2d 725, 770 (1966)
 
 
 [3]
 Section 74.1107a provides that,
 No CATV system operating in a community within the predicted Grade A contour (defined as the area in which a good picture is received 90% Of the time at the best 70% Of the locations) of a television broadcast station in the 100 largest television markets shall extend the signal of a television broadcast station beyond the Grade B contour (defined as an imaginary line along which a good picture may be expected 90% Of the time at the best 50% Locations) of that station, except upon a showing approved by the Commission (in a full evidentiary hearing) that such extension would be consistent with the public interest.
 
 
 [4]
 Section 74.1107d provides that the petition under Section 74.1109 shall take into account considerations set forth in paragraph 149 of the Second Report, supra, 2 F.C.C.2d at 785 where the Commission calls for a 'case-by-case judgment' when CATVs purpose to expand from a 'few thousand subscribers in one part or suburb of a community to the potential of hundreds of thousands throughout the entire community.'
 
 
 [5]
 Escondido had not yet begun operations, but falls within the 'Grade B' exception
 
 
 [6]
 Defined in note 3, supra
 
 
 [7]
 In United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), the Court upheld the Commission's authority under the Communications Act of 1934 to regulate CATVs and to issue the temporary prohibitory order. With the exception of First Amendment objections, it is not now contended that the Commission lacks the authority to issue the order presently reviewed if the hearing and the related proceedings were appropriate from an evidentiary and procedural standpoint
 
 
 [8]
 Not all the specified issues required prediction of the general market conditions in the future. The hearing was also designed to determine the extent of CATV operations as of February 15, 1966, and other relevant dates; the predicted Grade A contours of San Diego stations and Grade B contours of Los Angeles stations; whether San Diego television signals are degraded by CATV systems; and the plans of the CATV's for program origination. There is no contest as to the findings on these issues except for Midwest's objections to the decision to await the outcome of tests for an adequate technical solution to the problem of degradation of VHF signals by CATV operations. The Commission's decision in this matter is reasonable on the evidence before it
 
 
 [9]
 The order also permitted unlimited program origination by CATVs on a test basis, but to protect local UHF stations advertising was not allowed on such programs. This latter part of the order has been superseded by new CATV regulations, 74.1111 and 74.1117, released during the pendency of the present appeal, and is not now contested. First Report and Order, adopted October 24, 1969, released October 27, 1969. The new regulations cited above, however, do not include multiple ownership rules which were previously proposed and are apparently still subject to rule making proceedings. See, First Report, supra, par. 2. Nevertheless, we do not consider the Commission to have abused its discretion in denying Midwest's request to reopen the record to consider the effect of acquisitions of Mission and Southwestern. The Commission decided the matter should be resolved in general rule making proceedings and we do not question its authority to defer this matter for that reason
 
 
 [10]
 In deciding this aspect of the case we have considered but are unable to agree with Mission's contention that 47 CFR 74.1109 violates due process of law in the absence of more clearly defined ground rules for future CATV operations
 
 
 [11]
 See also, United States v. Southwestern Cable Co., supra, 392 U.S. at 180, 88 S.Ct. at 2007, where the Court, although passing on a different aspect of the present proceedings, see note 7, supra, recognized that 'in this area of rapid and significant change, there may be situations in which its generalized regulations are inadequate' and for this reason, "the administrative process (must be viewed to) possess sufficient flexibility to adjust itself," citing F.C.C. v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940)
 
 
 [12]
 See, note 8, supra. The facts relating to issues of this kind have been described by Professor Davis as 'adjudicative' facts, as opposed to 'legislative' facts which require expert opinions and forecasts. See 1 Davis, Administrative Law, 7.02 at 413 and 7.20 at 506; American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966)
 
 
 [13]
 See, note 12, supra. With regard to this distinction it has been observed that 'There is nothing in the APA that compels all issues to be treated alike in the case of an adjudication or which precludes the introduction in such a proceeding of data bearing on broad questions of policy.' Shapiro, 'The Choice of Rulemaking or Adjudication in the Development of Administrative Policy,' 78 Harv.L.Rev. 921, 936 (1965)
 
 
 [14]
 Undue weight does not appear to have been accorded to the Fischman Report, as argued by the CATV petitioners. Such weight as was given it was within the allowable discretion of the agency
 
 
 [15]
 The Commission's reversal of the hearing examiner was by a 4-3 vote. The dissenting views principally were that there was no evidence that UHFs could succeed in San Diego and that the Commission's decision in this regard was based on 'preconceptions, assumptions, and theoretical views as to the desirable result.'
 
 
 [16]
 5 U.S.C. 556(e) provides that,
 When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary.
 
 
 [17]
 In Colorado Radio Corp. v. FCC, 73 App.D.C. 225, 228, 118 F.2d 24, 27 (1941), the court remarked that 'the fact that a new station was operating did not have to be put in the record for the Commission could * * * take official notice of it.'
 
 
 [18]
 In passing on Southwestern's request to reopen we restrict ourselves to matters brought to the attention of the Commission in the petition for reconsideration. We cannot hold that the Commission abused its discretion or its statutory obligations because of factual matters raised for the first time on appeal
 
 
 [19]
 In Pikes Peak Broadcasting Co. v. FCC, 137 U.S.App.D.C. 234, 422 F.2d 671, we commented that 'it is important to emphasize, and perhaps decisive, that the Commission's judgment on all these economic forecasts is a provisional one, subject to modification * * *.'