442 F.2d 825
 143 U.S.App.D.C. 103
 POOLE BROADCASTING COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Michigan Bell Telephone
Company, Wonderland Ventures, Inc., Intervenors.
POOLE BROADCASTING COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Wonderland Ventures, Inc., Intervenor.
 Nos. 23704, 23828.
 United States Court of Appeals, District of Columbia Circuit.
 Argued May 18, 1970.
Decided Feb. 22, 1971.
 
 Mr. Joel Rosenbloom, Washington, D.C., with whom Mr. J. Roger Wollenberg, Washington, D.C., was on the brief, for petitioner.
 Mr. Edward J. Kuhlmann, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, and John H. Conlin, Associate General Counsel, Federal Communications Commission, were on the brief, for respondents. Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, also entered an appearance for respondent, Federal Communications Commission. Mr. Howard E. Shapiro, Atty., Department of Justice, entered an appearance for respondent, United States of America.
 Mr. Morton L. Berfield, Washington, D.C., with whom Mr. Lewis I. Cohen, Washington, D.C., was on the brief, for intervenor Wonderland Ventures, Inc.
 Messrs, Hugh B. Cox and E. Edward Bruce, Washington, D.C., were on the brief for intervenor Michigan Bell Telephone Co.
 Before BAZELON, Chief Judge, and ROBINSON and MacKINNON, Circuit judges.
 PER CURIAM:
 
 
 1
 Petitioner, Poole Broadcasting Company, the licensee of VHF television station WJRT-TV in Flint, Michigan, seeks review of two orders of the Federal Communications Commission: (1) an Order and Certificate released November 19, 1969, granting intervenor Michigan Bell Telephone Company authority pursuant to Section 214 of the Communications Act, 47 U.S.C. 214, to construct and operate CATV channel facilities in and around Flint, Michigan; and (2) a Memorandum Opinion and Order released December 24, 1969, denying petitioner's request that intervenor Wonderland Ventures, Inc., be prohibited from carrying four Detroit stations and one Windsor, Ontario, station as part of its CATV offering in Flint.[1] We affirm the Commission's first order, but vacate the second and remand for reconsideration.
 
 
 2
 i. The Background of this Litigation
 
 
 3
 On April 13, 1966, intervenor Wonderland gave notice of an agreement with Michigan Bell for construction of a CATV system serving Flint, Michigan. signals of five stations located in the Detroit-Windsor signals of five stations located in the Detriot-Windsor area and the signals of several other stations located in Flint and neighboring cities. Sixty days later, on June 13, 1966, petitioner Poole filed with the Commission a petition under 47 C.F.R. 74.1109, seeking an order preventing Wonderland from carrying the signals of the Detroit-Windsor stations.
 
 
 4
 Section 74.1109 provides a procedure for television operators to seek from the Commission ad hoc rulings where special factual circumstances may warrant departures from the general rules. Poole, in seeking such relief, alleged that a problem was presented similar to that referred to in footnote 69 of the Commission's Second Report and Order.[2] There the Commission took note of a situation that might call for a variance from the general distant signal rule, which allows a CATV system to operate so long as it does not involve the extension of a signal beyond its Grade B coverage into one of the top 100 major television markets.[3] The Commission stated:
 
 
 5
 With possibly only the rarest exception, CATV activity which does not involve extension of a signal beyond its Grade B contour may freely continue.[69] 69. If two major markets each fall within one another's grade B contour (e.g., Washington and Baltimore), this does not mean that there is no question as to the carriage by a Baltimore CATV system of the signals of Washington; for in doing so and thus equalizing the quality of the more distant washington signals, it might be changing the viewing habits of the Baltimore population and thus affecting the development of the Baltimore independent UHF station or stations. Such instances rarely arise, and can, we think, be dealt with by appropriate petition or Commission consideration in the unusual case where a problem of this nature might arise.[4] Since Flint was the 46th television market in the country and Detroit the sixth, and since Flint lies within the Grade B contours of the Detroit-Windsor stations, a footnote 69 question was presented.
 
 
 6
 Because Poole's petition was filed more than thirty days after Wonderland had given notice, the mandatory stay provisions of Section 74.1105(c) of the rules (forbidding implementation of proposed CATV service pending resolution of requests for relief) were inapplicable. Wonderland filed an opposition pleading on June 29, 1966, urging denial of the Poole petition and stating that 'the first twenty-seven mile section of this system is already installed, and negotiations are proceeding with regard to installing additional sections.' The Commission took no action on the matter, and on September 30, 1966, Michigan Bell commenced operation of the initial section of the Flint CATV system.
 
 
 7
 As of that date, the Commission had asserted jurisdiction over only the rates charged by common carriers for facilities designed to provide local distribution service to CATV operators.[5] Not until October 20, 1966, did the Commission indicate that it would begin an investigation to consider whether Section 214 of the Communications Act, 47 U.S.C. 214, required Commission certificates of public convenience and necessity prior to construction and operation of such facilities by common carriers. Michigan Bell continued under its contract with Wonderland to construct and operate CATV distribution facilities in Flint. On June 25, 1968, the Commission finally held that it did have jurisdiction under Section 214,[6] and it directed various common carriers, including Michigan Bell, to file applications under Section 214 for all CATV construction theretofore undertaken. In addition, it ordered these companies to cease and desist from further construction and operation of CATV facilities until Section 214 certificates had been obtained. The operation of facilities that were completed on or before the release date of the decision, however, was permitted if application for Section 214 certificates were filed and if certain other conditions were met. By this time, some thirty-five percent of Flint had been provided with CATV facilities in operation.
 
 
 8
 On August 6, 1968, Michigan Bell filed a request for certification pursuant to Section 214 for its CATV local distribution system, existing and proposed, in Flint. After notice of the filing of the application became public, Poole asked that the Commission consider in the Section 214 proceeding the objections that Poole had previously filed to Wonderland's proposal to transmit the five Detroit-Windsor signals. It further asked for the issuance of an order limiting the carriage of the challenged signals to the CATV system's then existing dimensions, at least pending resolution of the rule-making proceeding just announced on December 13, 1968, in a Notice of Proposed Rule-Making and Notice of Inquiry, Docket No. 18397.[7] If the proposed rules became applicable to Wonderland, it would not be able to broadcast the Detroit-Windsor signals without obtaining retransmission consent.[8] Pending conclusion of the rule-making proceeding, the Commission deferred action on all petitions under Section 74.1109 for waiver of the distant signal rules; but the Commission 'grandfathered' CATV systems which already carried Grade B signals into another major market.[9]
 
 
 9
 Almost a year later, on November 10, 1969, the Commission released the first order challenged in this court. It granted the Section 214 certificate of convenience and necessity sought by Michigan Bell, stating that the grant is 'without prejudice to any Commission action which may hereafter be indicated as a result of * * * the request * * * of Poole Broadcasting Company under Section 74.1109 of the Commission's Rules and pursuant to footnote 69 of the Second Report and Order on CATV.' Two weeks later, Poole filed a petition for review of the Commission's order in this court (No. 23,704) and simultaneously filed with the Commission a motion for stay of the order pending judicial review. Poole's motion argued that the establishment of expanded Detroit-Windsor service throughout Flint and surrounding areas would render moot both judicial review of the grant to Michigan Bell and the underlying footnote 69 issue, in view of the Commission's long-established reluctance to disrupt services which any subscribers had become accustomed to receive.
 
 
 10
 On December 24, 1969, before Michigan Bell was able to complete any further extensions of its Flint facilities as authorized by its Section 214 certificate, the Commission released two separate orders. The first granted Poole's motion for a stay to the extent of 'precluding CATV carriage of Detroit-Windsor signals in areas not presently served, pending judicial review.' The other considered and denied Poole's basic request for Section 74.1109 relief. It held that the proposed rules were inapplicable to the already existing Flint CATV system so there was no need to defer ruling on Poole's petition, pending completion of the Docket No. 18397 rule-making proceeding. Applying the previously established policies of the 1966 Second Report and Order, therefore, it found that Poole's showing was inadequate to justify the relief it sought. On December 31, 1969, Poole filed a petition for review of this second order (No. 23,828), and the case was consolidated with No. 23,704.
 
 
 11
 II. The November 10, 1969, Order Granting Michigan Bell Section 214 Certification
 
 
 12
 Poole made no attempt before the Commission or before this court to argue that the Commission has a general obligation to condition its Section 214 certifications so as to regulate CATV operators. Poole's quarrel in these cases is not directly with Michigan Bell, but with Wonderland. Even if the Commission had granted Poole's Section 74.1109 petition for special relief, there would be no ground for stopping construction by Michigan Bell, since seven of the twelve channels that Wonderland intends to carry are not being challenged. It makes no difference to Michigan Bell how many channels are carried on the lines it sets up.
 
 
 13
 Poole's sole interest in intervening in the Section 214 proceeding, then, stemmed from its fear that a grant of certification to Michigan Bell would prejudice its petition for special relief. What it feared was something quite specific: that before a Commission decision on the Section 74.1109 petition came down, Michigan Bell would complete the entire CATV distribution system and Wonderland would commence broadcasting the five Detroit-Windsor signals to all of Flint. Poole feared that once that had happened, it would be much harder to persuade the Commission of the merit of its petition, since a finding in favor of Poole would then require 'rolling back' an established set of signals, something which the Commission has shown that it is reluctant to do.[10] Precisely this fear of prejudice was the major ground of Commissioner Cox's dissent to the certificate order.
 
 
 14
 But however well-founded petitioner's fears, they were not realized. The December 24th decision denying petitioner's request for special relief came down before Michigan Bell had constructed any additional distribution facilities, and therefore before Wonderland had expanded its broadcasting of the Detroit-Windsor stations. And because of the stay granted that same day, Wonderland has still been unable to expand its broadcasting of those stations. Since petitioner's attack on the certification order turned solely on its unrealized fear of prejudice, we affirm the Commission's decision to issue that order.
 
 
 15
 III. The December 24, 1969, Order Denying Petitioner Poole's Request for Special Relief
 
 
 16
 Poole's main contention in attacking this second order is that the Commission erred in holding the Flint system entirely exempt from the proposed rules. It erred, therefore, in holding that the interim policies announced in the 1968 Notice 'grandfathered' the entire Flint system-- constructed and unconstructed. Paragraph 53 of the 1968 Notice reads:
 
 
 17
 We are proposing to 'grandfather' the present service of CATV systems which would otherwise be prohibited or restricted by the proposed rules, in order to avoid substantial disruption to the CATV subscribers. * * * Any rules adopted would be applicable upon their effective date to all CATV service commenced after December 20, 1968, including service not barred by Section 74.1105(c). However, in the event that the rules finally adopted differ from the proposed rules, service authorized by the Commission to commence during the pendency of this proceeding will be grandfathered; also grandfathered is any service previously authorized by the Commission, whatever the commencement date of such service.[11]
 
 
 18
 This paragraph certainly lends itself to the interpretation that what could be grandfathered in Flint is only the CATV system as it was in actual operation at the cut-off date of December 20, 1968-- that is, the partial CATV system Michigan Bell had been able to complete before it was ordered to stop construction. Wonderland could continue to broadcast the Detroit-Windsor stations to those parts of Flint which were then receiving them, but further expansion of those broadcasts would be 'commencing' a 'CATV service,' and therefore the new rules would apply.[12] If this interpretation is correct, the Commission's ruling on Poole's Section 74.1109 petition, insofar as its affects this new service, should be postponed pending completion of the rule-making proceeding, and a stay granted to maintain the status quo.
 
 
 19
 On the other hand, the Commission might be of the opinion that paragraph 53 must be construed so that a system that was providing signals to any part of a community before December 20, 1968, would be exempt from the proposed rules and could be extended throughout that community. The Commission might have decided to give overriding importance to viewing the community as an entity and ensuring uniformity of service throughout, rather than attempting to impose varying qualities of service within the same community. Under this construction, 'service' to a community would be taken to have 'commenced' as soon as any part of the community was receiving the signals, and expanding to service the rest of the community would not be commencing a new service.
 
 
 20
 Alternatively, the Commission might have decided that a CATV service which is not halted by a mandatory stay within thirty days of its initial notice, under Section 74.1105(c), is 'authorized' for the purpose of the interim procedures and, by the last clause of paragraph 53, must be permitted to expand to the limits specified in its initial notice.
 
 
 21
 Having presented the apparent difficulty posed by paragraph 53, and the different ways of construing it, let us examine that part of the Commission's order which seems to deal with the question of 'partial grandfathering':
 
 
 22
 In the (1968 Notice), we proposed adoption of a rule, Section 74.1107(e), which would govern Footnote 69 situations in terms of 35-mile zones. * * * We expressly stated in paragraph 53 that this proposal was inapplicable to existing systems, in view of the disruption to subscribers which would otherwise occur. We must therefore examine this Section 74.1109 special relief in light of previously established policies and the showing made.
 
 
 23
 We reluctantly conclude that the flat statement in the above paragraph does not meet the threshold of articulateness that courts have required of administrative agencies.[13] As we have shown, paragraph 53 does not expressly solve the problem at all. Some construction of the rule is necessary, and that construction must be based on an evaluation of the conflicting policies which weigh on either side of the issue. No sign of such an evaluation appears in the Commission's order.
 
 
 24
 The baldness of the Commission's assertion suggests that the Commission may not have considered the question of conflicting constructions of paragraph 53 at all. This suggestion is bolstered by the fact that both the Commission and Wonderland argue on appeal that Poole did not raise the question of partial grandfathering below and that the Commission's order must be affirmed for that reason. The very fact that the Commission's order lends itself so easily to the conclusion that the question was not raised below manifests its inadequacy as a reviewable administrative decision.
 
 
 25
 It may seem wasteful to remand a case to an administrative agency when it appears that there are grounds upon which the agency could have justified its existing decision. But 'if an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment.'[14] The construction of paragraph 53 is a matter for the exercise of the Commission's discretion, and this court has jurisdiction to do no more than see that that discretion is properly exercised.[15] If the issue of partial grandfathering was sufficiently raised below, therefore, we have no alternative but to remand this case for reconsideration.[16]
 
 
 26
 The claim that Poole failed to raise the issue is at least colorable, since Poole's original Section 74.1109 petition for special relief sought the prohibition of carriage of the Detroit-Windsor station in all of Flint, and Poole continued to argue that position throughout the litigation. Nevertheless, after the 1968 Notice of Proposed Rule-Making (Docket No. 18397) was published, Poole sufficiently presented the partial grandfathering question in two pleadings. First, in the letter asking for consolidation of its Section 74.1109 petition with the Section 214 proceeding, Poole said:
 
 
 27
 We submit that relief comparable to that granted in Delaware County (i.e., an order confining the (Wonderland) system's carriage of Detroit-Windsor signals to those areas of Flint where main trunk cable is now laid, at least pending the resolution of the rule making proceeding in Docket No. 18397) would be the minimum step appropriate in the circumstances.
 
 
 28
 Second, in its motion for a stay pending judicial review of the Section 214 order, Poole said:
 
 
 29
 The interim procedures prescribed in (Docket No. 18397) provided that where a timely petition under Section 74.1109 raises a 'footnote 69' issue, the challenged service must be deferred pending completion of the rule making. * * *
 
 
 30
 * * * In Delaware County Cable Television Co., et al., 13 F.C.C.2d 899 (1968), the Commission dealt with a 'footnote 69' request for 74.1109 relief which was filed over a year after the relevant CATV system had given the requisite notice, and the systems had 'gone ahead with construction and begun offering service to the public' in 'good faith reliance on the lack of objections'. * * * The Commission held that these equities did not wholly override the public policies reflected in 'footnote 69' and ordered the carriage of adjacent-market signals confined to the dimensions of the system as of the date of its order, pending a full hearing. * * * Poole asks no more here.
 
 
 31
 Poole's many communications with the Commission were all part of a continued effort to get carriage of the Detroit-Windsor stations restricted as much as possible, so it was entitled to expect that its related letters and motions would be read when the Commission finally reached the underlying petition. Since, in addition, the Commission did feel bound to make a statement about the applicability of paragraph 53 in its order, we believe that Poole sufficiently gave the Commission 'an opportunity to rule'[17] on the question of the proper construction of paragraph 53.
 
 
 32
 IV. The Necessity for Holding an Evidentiary Hearing
 
 
 33
 In addition to the grandfathering question, if on remand the Commission should reaffirm its conclusion that the proposed rules do not apply it would seem that there is an additional issue which should be reexamined and clarified by the Commission.
 
 
 34
 Poole's brief combines two related issues: (1) whether the Commission's order denying the 47 C.F.R. 74.1109 request for special relief was correct on the merits; and (2) whether the order should have been issued as it was without holding a full evidentiary hearing. When closely examined, however, the brief does present the argument that the Commission was in error in not ordering that an evidentiary hearing be held to explore the facts bearing on the issues raised by Poole's petition. The Commission denied Poole's request for relief on the merits, relying almost exclusively on information presented by letter, written comment, and other informal communications of the various affected parties.
 
 
 35
 Whenever a CATV system proposes to pick up a broadcast signal and extend it beyond the limits of its Grade B contour into a major market area (which is also within the Grade A contour of a broadcast signal originating in that market area), 47 C.F.R. 74.1107 requires that a full evidentiary hearing be held to demonstrate to the Commission that the proposed CATV service is consistent with the public interest. Situations of this kind are referred to as 'distant signal' cases, and the burdens of proceeding and proof are both on the CATV system. 47 C.F.R. 74.1109 permits a waiver of the evidentiary hearing requirement in appropriate cases, but again the burden is on the CATV system to petition for the waiver and convince the Commission that a waiver is appropriate.
 
 
 36
 In footnote 69 cases such as the present one, where the CATV system is not proposing to extend a broadcast signal beyond its Grade B contours but the effect of its operations is to equalize the quality of the more distant signal, the procedural steps are somewhat different. The only burden then on the CATV system is to give notice of its proposed operations to interested parties, including affected broadcasters, and the burden of proceeding and burden of proof in any proceedings challenging the proposed operations are both on the broadcaster instead of the CATV system. The question for the moment is whether the 47 C.F.R. 74.1107 evidentiary hearing requirement applies in footnote 69 cases, as well as in distant signal cases.
 
 
 37
 By its express terms, 47 C.F.R. 74.1109 is directed toward distant signal situations. However, in the Commission's leading decision in Midwest Television, Inc.,[18] the proposition was stated that
 
 
 38
 The issues as to potential CATV penetration and impact on UHF, the evidence, and the pertinent policy considerations are the same whether San Diego is just within (a footnote 69 situation) or just beyond (a distant signal situation) the fringe of the Grade B contours of the Los Angeles stations. The sole difference is that the burden of proceeding and of proof lies on the CATV system in the case of distant signal proceedings under Section 74.1107(b) and is largely on the petitioning broadcaster in a footnote 69 proceeding. * * *[19]
 
 
 39
 Thus, arguably the hearing requirements should be applicable to footnote 69 cases such as the present one.
 
 
 40
 Previous Commission decisions in footnote 69 cases support this conclusion. For example, in the Midwest Television case, supra, the Commission observed:
 
 
 41
 However, we concluded that the public interest required thorough exploration of these questions (e.g., potential CATV penetration, and the effect on existing and potential broadcasters) before CATV operations became established or well entrenched in major markets and that evidentiary hearings on the proposals and circumstances in major markets would afford an appropriate vehicle for reaching a policy determination as to the particular market. * * *[20]
 
 
 42
 In Midwest Television both distant signal and footnote 69 issues were involved, but in numerous cases where only a footnote 69 question was presented the Commission has required an evidentiary hearing. Thus, in Buckeye Cablevision, Inc.[21] a broadcaster petitioned to prevent the importation of Detroit-Windsor signals into the Toledo area, and specifically requested an evidentiary hearing. In granting the request for a hearing the Commission stated:
 
 
 43
 The petition raises questions which, under the policies expressed in the Second Report and Order, requires factual examination. The lack of information concerning the impact of CATV upon UHF activity in Toledo compels that a meaningful record be established before we render a decision. * * * Commission action based on such a record should thus have some valid relationship to the facts of CATV effect in the market.[22]
 
 
 44
 In Vision Cable Co. of Rhode Island, Inc.,[23] a footnote 69 case where it does not appear that a specific request was made by the petitioning broadcaster for a hearing, the Commission said:
 
 
 45
 In the light of our present policies, and particularly our recent decision in Midwest, supra * * * we be believe that a hearing is called for to determine whether the Vision Cable proposal would have a significantly dampening effect on future interest in UHF channel 16. This issue will, therefore, be the subject of a hearing.[24]
 
 
 46
 And in Delaware County Cable Television Co.,[25] a footnote 69 case where there was an untimely petition for specific relief just as in the present case, the Commission stated:
 
 
 47
 We have recognized that footnote 69 problems are presented by operation of CATV around Philadelphia carrying New York signals. * * * Beyond this we feel that a hearing is necessary. * * *[26]
 
 
 48
 In a number of cases involving the carrying of Detroit-Windsor signals by CATV systems in adjacent areas, the Commission has prevented such carriage 'pending our next consideration of these markets.'[27] Also, 'the question whether evidentiary hearing is required before carriage of the Detroit and Windsor signals can be authorized will be reserved until our next overall consideration of these markets.'[28] In the G.T.&E. case the Commission also said:
 
 
 49
 Nor has G.T.&E. persuaded us of special circumstances warranting a departure from the determination made in Fetzer Cable Vision, supra, where carriage of Detroit and Windsor signals into the Lansing market was not permitted without hearing.[29]
 
 
 50
 Thus it appears that the burden may be on the CATV system in a footnote 69 case to demonstrate that a hearing is not necessary. Finally, and of key importance, in a footnote to the quote above from the G.T.&E. case the Commission noted:
 
 
 51
 2. There are three UHF channels assigned within the Flint market (the market the present case is concerned with): Channel 66, Flint; channel 61, Bay City; and channel 42, Saginaw. Thus, the considerations applicable to the Lansing market (where it was held that a hearing was required) may also apply to the Flint market.[30]
 
 
 52
 The Commission order involved in No. 23,828 resolves the case on the merits against Poole, without even mentioning the hearing question, and in the face of the Commission's own recognition in the G.T.&E. case that CATV expansion carrying Detroit-Windsor signals into the Flint area may require a hearing. The order gives no reasons why a hearing was not required in the present case; does not even indicate that the question was considered. Although there have been a few cases where determinations such as the present one were made without a hearing, the Commission has been equally silent in those cases as to why that result was reached.[31] In Fetzer Cable Vision,[32] the Commission did make a weak attempt to explain its action, but that weak attempt is of little help to the Commission in explaining its action in the present case.
 
 
 53
 Furthermore, in resolving the present case against Poole on the merits, the Commission stated that there had been 'no sufficient demonstration concerning the alleged adverse impact of the challenged CATV service on their revenues, audience size, or quality of programming, or on the prospects for activation of other stations (UHF) in the area.'[33] But questions as to potential CATV penetration and affect on present broadcasters are precisely the ones which the Commission has said in other cases require exploration at an evidentiary hearing, in order that the Commission can make a meaningful determination as to where the public interest lies.[34] As to the suggestion that there was no showing by Poole concerning the 'prospects' for UHF development in Flint, in other cases, the Commission has indicated that even a potential for UHF development requires investigation. For example, in Vision Cable Co. of Rhode Island, Inc.,[35] it was held that 'a hearing is called for to determine whether the Vision Cable proposal would have a significantly dampening effect on future interest in UHF channel 16.'[36]
 
 
 54
 There are any number of reasons why a case could be made for not holding a hearing in connection with the present case. For example, despite the suggestion in the G.T.&E. case, adverted to above, that the burden is on the CATV system to demonstrate that a hearing is not necessary, the Commission may take the position that the broadcaster not only has the ultimate burdens of proceeding and proof, but also the burden of showing the necessity of a hearing in footnote 69 cases.[37] And as suggested in the G.T.&E. case, there may be 'special circumstances' which obviate the need for a full hearing. But the Commission has never undertaken to logically develop what these 'special circumstances' might be in general, nor in the particular setting of the present case. As concerns the decision to waive a hearing in a distant signal case, this court has warned the Commission that 'its decisions should more clearly articulate the public interest considerations on which it determines to waive.'[38] The need for Commission explanation as to where hearings fit into footnote 69 cases is even more necessary.
 
 
 55
 Should the Commission affirm on remand that the new footnote 69 rules do not apply to this case and the system is not grandfathered as to the entire contemplated area of service, then the hearing question becomes important. In that event, whether the CATV system would be permitted to expand its carriage of Detroit-Windsor signals beyond the area presently served would depend on the proper application of the old footnote 69 policies. Therefore, if the above occasion arises the Commission is directed to reconsider whether a hearing is necessary to make the determination, and explain fully why it was or was not necessary.
 
 V. Interim Relief
 
 56
 The stay presently in effect preventing Michigan Bell and Wonderland from broadcasting the Detroit-Windsor stations beyond the limits of the system on December 20, 1968, was issued pending judicial review of the Section 214 certification order, which we are affirming. The Commission may well construe the stay, then, as expiring immediately. But by granting that stay, the Commission showed its willingness to maintain the status quo until the questions involved in this litigation are resolved. A prompt motion by Poole for similar relief, therefore, pending Commission reconsideration of the Section 74.1109 petition and judicial review thereof, may be viewed favorably by the Commission. In any event, we feel that the Commission must be given an opportunity to decide whether administrative policies militate against such relief.
 
 
 57
 The order in No. 23,704 is affirmed. The order in No. 23,828 is vacated and remanded for reconsideration in light of this opinion.
 
 
 
 [1]
 The first order is challenged in No. 23,704, the second in No. 23,828
 
 
 [2]
 2 F.C.C.2d 725, 786 (1966)
 
 
 [3]
 For a summary of the rules and explanations of the technical terms, see Midwest Television, Inc. v. F.C.C., 138 U.S.App.D.C. 228, 426 F.2d 1222 (Feb. 4, 1970)
 
 
 [4]
 2 F.C.C.2d at 786
 
 
 [5]
 Common Carrier Tariffs for CATV Systems, 4 F.C.C.2d 257 (1966)
 
 
 [6]
 General Telephone Co. of Cal., 13 F.C.C.2d 488, aff'd, 134 U.S.App.D.C. 116, 413 F.2d 390, cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969)
 
 
 [7]
 15 F.C.C.2d 417, 33 Fed.Reg. 19028
 
 
 [8]
 This requirement would force the CATV operator to compete with local stations for the right to retransmit the Detroit-Windsor stations
 
 
 [9]
 In other words, the proposed rules, whenever adopted, would not be applied to the 'grandfathered' systems. 15 F.C.C.2d at 438 P53. This provision is discussed more fully at pp. 830-831 infra
 
 
 [10]
 Second Report and Order, 2 F.C.C.2d 725, 782, 785 (1966); CATV, 15 F.C.C.2d 417, 435 P45 (1968)
 
 
 [11]
 15 F.C.C.2d at 438
 
 
 [12]
 The present rules already provide a similar kind of 'partial grandfathering.' Section 74.1107(d) reads:
 The provisions of paragraphs (a) and (b) of this section shall not be applicable to any signals which were being supplied by a CATV system to its subscribers in a community on February 15, 1966, and pursuant to a franchise (where necessary) issued on or before that date: Provided, however, * * * That no CATV system located in a community in the 100 largest television markets, which was supplying to its subscribers on February 15, 1966, a signal carried beyond its Grade B contour, shall extend such service to new geographical areas within the same community where the Commission * * * determines that the public interest * * * would be served by appropriate conditions limiting the geographical extension of the system to new areas in the community.
 
 
 [13]
 SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1942); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)
 
 
 [14]
 SEC v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1942)
 
 
 [15]
 See Chae-Sik Lee v. Kennedy, 111 U.S.App.D.C. 35, 294 F.2d 231 (1961)
 
 
 [16]
 If a question of law is raised upon which the Commission 'has been afforded no opportunity to pass,' then a petition for reconsideration is a condition precedent to judicial review. 47 U.S.C. 405. Poole filed no such petition, so the Commission order could not be vacated for the above reason if the issue was not sufficiently raised below
 
 
 [17]
 See 47 U.S.C. 405 and note 16 supra
 
 
 [18]
 13 F.C.C.2d 478 (1968)
 
 
 [19]
 Id. at 489
 
 
 [20]
 Id. at 487-88
 
 
 [21]
 10 F.C.C.2d 745 (1967)
 
 
 [22]
 Id. at 746-747
 
 
 [23]
 14 F.C.C.2d 654 (1968)
 
 
 [24]
 Id. at 655
 
 
 [25]
 13 F.C.C.2d 899 (1968)
 
 
 [26]
 Id. at 901
 
 
 [27]
 E.g., Cascade Cable Television Co., 10 F.C.C.2d 611 (1967)
 
 
 [31]
 Triangle Cable Co., 17 F.C.C.2d 324 F.C.C.2d 205, 206 (1967)
 
 
 [29]
 Id. at 206
 
 
 [30]
 Id., n. 2
 
 
 [31]
 Triangle Cable Co-, 17 F.C.C.2d 324 (1969); Cablevision of Dunn, Inc., 12 F.C.C.2d 195 (1968)
 
 
 [32]
 6 F.C.C.2d 845 (1967)
 
 
 [33]
 Joint Appendix at 122
 
 
 [34]
 E.g., Midwest Television, Inc., 13 F.C.C.2d 478 (1968); Buckeye Cablevision, Inc., 10 F.C.C.2d 745 (1967); Midwest Television, Inc., 4 F.C.C.2d 610 (1966)
 
 
 [35]
 14 F.C.C.2d 654 (1968)
 
 
 [36]
 Id. at 655. See also Midwest Television, Inc., 4 F.C.C.2d 610 (1966)
 
 
 [37]
 This is suggested in General Electric Cablevision Corp., 8 F.C.C.2d 457 (1967)
 
 
 [38]
 Channel 9 Syracuse, Inc. v. FCC, 128 U.S.App.D.C. 187, 193, 385 F.2d 969, 975 (1967)